## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SLEEPBIT, LLC f/k/a RPSGROUP, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-CV-0537-CVE-FHM** |
| | ) | |
| **PUSH SOFTWARE INTERACTIONS, INC.** | ) | |
| **CHAD JONES, and ANDRE DOUCETTE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Defendant Push Software Interactions, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Dkt. # 12); Defendant Andre Doucette's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Dkt. # 14); Defendant Chad Jones' Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Dkt. # 16); and Sleepbit, LLC's Motion to Transfer Venue and Brief in Support (Dkt. # 22). Each of the defendants argues that it/he is not subject to personal jurisdiction in Oklahoma and each asks the Court to dismiss plaintiff's claims against it/him for lack of personal jurisdiction. Plaintiff responds that each of the defendants knowingly entered a business relationship with an Oklahoma business, and the Court can exercise personal jurisdiction over defendants. Plaintiff also argues that its claims fall within a mandatory forum selection clause in a confidentiality agreement, and it asks the Court to transfer this case to the United States District Court for the Eastern District of Oklahoma.

# I.

Sleepbit, LLC (Sleepbit) is in the business of designing tools and products "pertaining to individuals' sleep related health and airflow during sleep." Dkt. # 2-1, at 6. Sleepbit is a limited liability company organized under Oklahoma law with its principal place of business in Tulsa, Oklahoma. Id. at 5. The membership of Sleepbit consists of individuals who are citizens of Oklahoma and Arkansas and a limited liability company whose members are citizens of Oklahoma. Id. Sleepbit states that it has developed a "non-prescription home airflow self-assessment system . . . which uses a combination of airflow measurements during sleep and a lifestyle/health survey to determine issues related to an individual's sleep health." Id. at 6. Sleepbit's system requires an individual to purchase an airflow recording device and a mobile app that is compatible with iOS and Android devices. Id. Sleepbit had developed a device that would gather data about a user's airflow during sleep, but it still needed a mobile app that could collect the data from the Sleepbit device. Id.

On February 13, 2015, the manager of Sleepbit, Steve Wood, contacted Push Software Interactions, Inc (PSI) about developing the mobile app, and the chief executive officer of PSI, Chad Jones, represented that PSI would be willing to develop the mobile app. Id. at 7. Sleepbit and PSI executed a confidentiality agreement under which the parties agreed to keep any confidential information exchanged during the course of their business relationship confidential. Id. The confidentiality agreement contains the following choice of law and forum selection clause:

> This Agreement shall be construed under the laws of the State of Oklahoma, notwithstanding any conflict of law provision to the contrary. The forum for any proceeding or suit in law or equity arising from or incident to this Agreement shall be located in the applicable federal court for the Eastern District, Oklahoma, or state court in Tulsa County, Oklahoma.

Dkt. # 22-1, at 21. Sleepbit subsequently sent a request for proposal to PSI for the development of a Bluetooth-enabled app from testing to commercial launch. Dkt. # 2-1, at 7. On February 23, 2015, PSI submitted a mobile app proposal to Sleepbit and represented that development of the mobile app would take approximately nine to eleven weeks. Id. at 8. PSI submitted an updated proposal eliminating one feature of the mobile app and reducing the contract price by $7,000. Id. at 9. After the updated proposal was submitted by PSI, Sleepbit began to gather funding and PSI did not immediately begin to work on the mobile app. Id. On June 8, 2015, Jones and Wood spoke about funding for the mobile app project, and Wood advised Jones that Sleepbit had not finalized arrangements to secure the necessary financing. Id.

Sleepbit acquired the funding needed to proceed with development of the mobile app and, pursuant to the mobile app proposal, wired 50 percent of contract price to PSI. Id. Sleepbit primarily interacted with Jones and Andre Doucette,[1] the product director for PSI, and Jones and Doucette represented to Sleepbit that they were progressing with the mobile app. Id. at 10. Based on these representations, Sleepbit made another payment to PSI in the amount of $5,075, and Sleepbit sent a Sleepbit device to PSI to use in testing the mobile app. Id. PSI could not collect data using the Sleepbit device and Sleepbit sent a dongle to PSI to use for beta testing. Id. By June 2016,

---

[1]    Jones and Doucette cite the fiduciary shield doctrine and argue that contacts with Oklahoma made on behalf of PSI should not be considered as part of the personal jurisdiction analysis. Dkt. # 23, at 2; Dkt. # 25, at 2. The Tenth Circuit has explained that the fiduciary shield doctrine is a matter of state law that imposes "a judicial rule of construction for interpreting the intended scope of a state's long-arm statute." Newsome v. Gallacher, 722 F.3d 1257, 1276 (10th Cir. 2013). Oklahoma courts have not adopted the fiduciary shield doctrine and the Oklahoma Supreme Court historically construes the state's long-arm statute as broadly as due process will allow, and it is doubtful that the fiduciary shield doctrine would apply in Oklahoma courts. Id. at 1278-79. The Court declines to apply the fiduciary shield doctrine and will consider all of Jones' and Doucette's contacts with Oklahoma to determine whether the Court has personal jurisdiction over them.

Sleepbit was finalizing a promotional video for its product based on PSI's representations concerning the status of the mobile app.  Id. at 11.  On July 22, 2018, Sleepbit sent a payment of $15,881.25 to PSI, but Sleepbit was starting to doubt that PSI was making progress with the mobile app.  Id. Sleepbit states that an individual assisting with the development of the Sleepbit device, Bill Ardrey, was able to connect to the mobile app using an iPad and he discovered that the mobile app was not functioning properly.  Id.  On November 10, 2016, Ardrey contacted Jones and asked for assistance in looking at the data saved to mobile device by the app.  Id.  Jones responded promptly to Ardrey's request and informed Ardrey that PSI was able to get the mobile app working on iOS devices.  Id. at 8-9.  Difficulties arose with communication between the Sleepbit device and mobile app, and PSI claimed that any problems were caused by Sleepbit's device.  Id. at 12.  Sleepbit delivered another Sleepbit device to PSI on January 30, 2017, but the problems with the mobile app were not getting resolved.  Id.  Jones and Doucette allegedly stopped communicating with Wood about the status of the mobile app.  Id.

On February 16, 2017, representatives of Sleepbit and PSI held a conference call, and Jones agreed to send the iOS and Android source code to Sleepbit.  Id. at 13.  Sleepbit claimed that it needed the source code to troubleshoot the alleged problems with the device identified by PSI, but Sleepbit had not received the source code as of February 21, 2017.  Id.  The source code for iOS devices was produced to Sleepbit on March 7, 2018, and Sleepbit claims that there were several problems with the source code.  Id. at 13-14.  The source code contained "To Do" notes indicating that the source code was not complete, and it appeared that PSI had not worked on the source code for several months.  Id. at 14.  Sleepbit continued to request status updates on PSI's work on the mobile app, and Jones represented to Sleepbit that PSI was successfully testing the mobile app with

the Sleepbit device on iOS and Android devices.  Id.  Jones informed Wood that PSI was "starting to piece together the elements needed to move to server testing," but PSI refused to give an estimate as to when the mobile app would be ready.  Id.

On April 4, 2017, Jones advised Wood that PSI was able to get data off of the mobile app, but the device would return to the wrong page and it appeared that there was a bug or a problem with the software code.  Id. at 15.  Sleepbit set a firm deadline of April 20, 2017 to submit Sleepbit's iOS platform to Apple for approval and to conduct control group testing on iOS and Android platforms. Id.  Jones claimed that there were issues with the risk assessment that affected how the mobile app was working, but Sleepbit believed that this was outside the scope of PSI's work under the parties' contract.  Id.  Sleepbit informed PSI that it was responsible only for making sure that the mobile app correctly converted in accordance with a risk assessment algorithm.  Id.  On April 24, 2017, PSI sent builds for the mobile app to Sleepbit, but the builds did not work for alpha testing and the builds appeared to be incomplete.  Id. at 16.  Wood advised Jones of these problems with the builds, and Jones responded that the builds were intended for review but not for testing.  Id.  Jones claimed that this was PSI's standard procedure and PSI typically sought customer feedback before completing the builds.  Id.  In May 2017, Ardrey began testing the mobile app and got an error message when he attempted to download the app onto an iOS device.  Id.  On May 15, 2017, Sleepbit directed PSI to stop working on the mobile app.  Id.  The parties continued to communicate over the summer of 2017 and PSI represented that it was close to finishing the mobile app.  Id. at 17.  However, by August 2017, Sleepbit had decided to cease working with PSI and it intended to hire a new designer for the mobile app.  Id.  Sleepbit hired another developer to complete the mobile app and none of the work performed by PSI could be used to expedite the new developer's work.  Id.

On July 11, 2018, Sleepbit filed this case in Tulsa County District Court alleging claims of breach of contract, unjust enrichment, and fraud against PSI, Jones, and Doucette. Defendants removed the case to this Court on the basis of diversity jurisdiction. Each defendant has filed a motion to dismiss the case for lack of personal jurisdiction. Dkt. ## 12, 14, 16. Sleepbit asks the Court to transfer this case to the Eastern District of Oklahoma based on the forum selection clause in the confidentiality agreement. Dkt. # 22.

## II.

Plaintiff asks the Court to transfer this case to the Eastern District of Oklahoma, because the confidentiality agreement contains a forum selection clause requiring claims arising under the agreement to be litigated in Tulsa County District Court or the Eastern District of Oklahoma. Dkt. # 22. PSI responds that plaintiff's claims do not arise out of the confidentiality agreement, even under a broad interpretation of that agreement, and Jones and Doucette are not parties to the confidentiality agreement. Dkt. # 28.

The Court must initially determine if the parties' agreement contains a venue selection clause or a forum selection clause. Unlike a forum selection clause, a venue selection clause authorizes, but does not require, litigation in certain forums and it may permit multiple acceptable forums for litigation. SBKC Serv. Corp. v. 1111 Prospect Partners, L.P., 105 F.3d 578, 582 (10th Cir. 1997). "The existence of a venue selection clause does not impose an absolute duty nor does it endow a party with an absolute right to have every dispute between the parties litigated in the named forum." Hospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1163 (10th Cir. 1982). On the other hand, forum selection clauses are presumed to be valid and the burden is on the party resisting enforcement to show that enforcement of the clause would be unreasonable under the circumstances. Carnival

Cruise Lines, Inc. v. Shute, 499 U.S. 585, 589 (1991); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972); Milk 'N' More, Inc. v. Beavert, 963 F.2d 1342, 1346 (10th Cir. 1992). The party resisting enforcement of a forum selection clause "carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 957 (10th Cir. 1992). The Tenth Circuit has found that forum selection clauses fall into two general categories - mandatory or permissive. Excell, Inc. v. Sterling Boiler & Mechanical, Inc., 106 F.3d 318, 321 (10th Cir. 1997). A mandatory forum selection clause must contain "clear language showing that jurisdiction is appropriate only in the designated forum." Id. (quoting Thompson v. Founders Group Int'l, 886 P.2d 904, 910 (Kan. Ct. App. 1994)). A permissive forum selection clause permits suit to be brought in a particular jurisdiction, but does not prevent the parties from litigating in a different forum. SBKC Serv. Corp., 105 F.3d at 581-82.

The parties do not dispute that the confidentiality agreement contains a mandatory forum selection clause. The confidentiality agreement states that:

> The forum for any proceeding or suit in law or equity arising from or incident to this Agreement shall be located in the applicable federal court for the Eastern District, Oklahoma, or state court in Tulsa County, Oklahoma.

Dkt. # 22-1, at 21. Jones signed the confidentiality agreement on behalf of PSI, but neither Jones nor Doucette signed the agreement in their individual capacities. Id. The parties entered the confidentiality agreement "for the limited purpose of evaluating the suitability of entering into a business relationship . . . ." Id. at 19. The confidentiality agreement further states that "[e]ach party agrees to limit its use of any **Confidential Information** received from the other party to the evaluation of the suitability of entering into a business relationship, for negotiating in good faith the

terms and conditions of a business relationship and for no other purpose unless the parties shall otherwise agree in writing." Id. at 20.

Sleepbit argues that its claims in this case fall within the scope of the forum selection clause in the confidentiality agreement, because the confidentiality agreement memorialized the parties' intention to enter into a business relationship. Dkt. # 22, at 9. According to Sleepbit, there would have been no business relationship if PSI had not signed the confidentiality agreement, and Sleepbit's claims arise out of the contract that arose out of this initial agreement to enter a business relationship with PSI. The Tenth Circuit has stated that a forum selection clause must be evaluated using ordinary principles of contract interpretation, and a forum selection clause governing claims arising out of a contract will generally apply when "resolution of the claims relates to interpretation of the contract" or "when the claims 'involv[e] the same operative facts as a parallel claim for breach of contract . . . ." Kelvion, Inc. v. PetroChina Canada Ltd., 918 F.3d 1088, 1093 (10th Cir. Mar. 15, 2019). The forum selection clause in the confidentiality agreement does not govern any claim that could arise out of the parties' subsequent business relationship but, instead, it is limited to proceedings arising out of "this Agreement." Dkt. # 22-1, at 21. Sleepbit has not alleged that defendants misused confidential information or otherwise violated the confidentiality agreement, and it is not reasonable to construe any of Sleepbit's claims as similar to claim for breach of the confidentiality agreement. In fact, the Court could wholly ignore that the parties entered a confidentiality agreement, and this would not in any way affect the Court's resolution of Sleepbit's claims arising out of defendants' alleged failure to design a mobile app. Sleepbit has not shown that the claims alleged in its petition arise from or are incident to the confidentiality agreement, and the

forum selection clause in the confidentiality agreement is inapplicable. Therefore, Sleepbit's motion to transfer this case to the Eastern District of Oklahoma (Dkt. # 22) is denied.[2]

## III.

Defendants argue that they are not subject to personal jurisdiction in Oklahoma, and they ask the Court to dismiss plaintiff's claims against them (Dkt. ## 12, 14, 16). The individual defendants, Jones and Doucette, are residents of Saskatchewan, Canada, and PSI is organized under the laws of Canada with its principal place of business in Saskatchewan. Defendants argue that the forum selection clause in the confidentiality agreement does not apply to Sleepbit's claims, and they do not otherwise have sufficient minimum contacts with the forum for this Court to exercise personal jurisdiction over them. The Court has already determined that the forum selection clause is inapplicable to plaintiff's claims, and much of Sleepbit's arguments as to personal jurisdiction rely on the forum selection clause as a basis for the Court to exercise personal jurisdiction over defendants.

When a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing that the Court has personal jurisdiction over the defendant. OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998). "When a district court rules on a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, . . . the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." Id. (citations omitted). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true

---

[2]     Sleepbit is reminded that it is the plaintiff and it controls whether the case will proceed in this Court. Sleepbit may seek to voluntarily dismiss its claims and refile the case in the Eastern District of Oklahoma.

would support jurisdiction over the defendant." Id. at 1091. "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). The allegations of the complaint must be accepted as true to the extent they are uncontroverted by a defendant's affidavit. Taylor v. Phelan, 912 F.2d 429, 431 (10th Cir. 1990). If the parties provide conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor. Id.

For a court to exercise personal jurisdiction over a nonresident defendant in a diversity action, the plaintiff must demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the United States Constitution. See Okla. Stat. tit. 12, § 2004(F). "Because Oklahoma's long-arm statute permits the exercise of jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry." Intercon, Inc. v. Bell Atl. Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000) (citing Rambo v. Am. S. Ins. Co., 839 F.2d 1415, 1416 (10th Cir. 1988)); see also Hough v. Leonard, 867 P.2d 438, 442 (Okla. 1993).

"Due process requires that the nonresident defendant's conduct and connection with the forum state are such that the nonresident could reasonably anticipate being haled into court in that state." Conoco, Inc. v. Agrico Chem. Co., 115 P.3d 829, 835 (Okla. 2004) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). "The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant 'so long as there exist minimum contacts between the defendant and the forum State.'" Intercon, 205 F.3d at 1247 (quoting World-Wide Volkswagen, 444 U.S. at 291). The existence of such minimum contacts must be shown to

support the exercise of either general jurisdiction or specific jurisdiction. Id. "When a plaintiff's cause of action does not arise directly from a defendant's forum related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state." Id. (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-16 & n.9 (1984)). Alternately, a court "may, consistent with due process, assert specific jurisdiction over a nonresident defendant 'if the defendant has purposefully directed his activities at the residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.'" Id. (quoting Burger King Corp., 471 U.S. at 472).

Defendants argue that they are not subject to general personal jurisdiction in Oklahoma, because defendants do not reside in Oklahoma and PSI does not conduct or solicit business in Oklahoma. Sleepbit does not argue that the Court could exercise general personal jurisdiction over any of the defendants, but Sleepbit contends that each of the defendants knowingly entered a business relationship with an Oklahoma entity and should have foreseen that they could be haled into an Oklahoma court for claims arising out of this business relationship. Specific jurisdiction requires a two-step analysis. First, courts "must consider whether 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Benton v. Cameco Corp., 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting World-Wide Volkswagen, 444 U.S. at 297). To do so, courts "determine whether the defendant has sufficient minimum contacts with the forum." Zenergy, Inc. v. Coleman, 2009 WL 3571314, *5 (N.D. Okla. Oct. 26, 2009) (citing OMI Holdings, 149 F.3d at 1091). If such minimum contacts exist, then courts must "consider whether the exercise of personal jurisdiction over the defendant offends 'traditional

notions of fair play and substantial justice.'" Benton, 375 F.3d at 1075 (quoting OMI Holdings, 149 F.3d at 1091).

For a court to exercise specific jurisdiction over a defendant, that defendant must have such minimum contacts with the forum state that it has "'purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "Within this inquiry we must determine whether the defendant purposefully directed its activities at residents of the forum, and whether the plaintiff's claim arises out of or results from 'actions by the defendant himself that create a substantial connection with the forum state.'" OMI Holdings, 149 F.3d at 1091 (citing Burger King, 471 U.S. at 472; Asahi Metal Indus. Co. v. Sup. Ct. of Cal., 480 U.S. 102, 109 (1987)). Contacts exist "where the defendant 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations" between himself and residents of the forum.'" Id. at 475-76 (citations omitted). Additionally, for a defendant's contacts with the forum state to serve as the basis for personal jurisdiction, the plaintiff's claims must arise out those contacts. See OMI Holdings, 149 F.3d at 1095 (citing Asahi, 480 U.S. at 109). The Court will separately consider whether plaintiff has alleged facts as to each defendant that would meet plaintiff's burden to make a prima facie showing that the defendant has sufficient minimum contacts with the forum to support this Court's exercise of personal jurisdiction.

**PSI and Jones**

Plaintiff argues that PSI is subject to personal jurisdiction in this Court, even without the forum selection provision, because PSI voluntarily entered a business relationship with an Oklahoma entity and purposefully availed itself of the privilege of conducting business in Oklahoma. "A

contract between an out-of-state party and a resident of the forum state cannot, standing alone, establish sufficient minimum contacts with the forum." Benton, 375 F.3d at 1077 (citing Burger King, 471 U.S. at 473). However, if the contract creates continuing relationships and obligations, it may be sufficient to establish minimum contacts. Id. The district court must consider the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determining whether the defendant purposefully established minimum contacts within the forum." Old Republic Ins. Co. v. Continental Motors, Inc., 877 F.3d 895, 905 (10th Cir. 2017).

The parties agree that Wood initially reached out to PSI on behalf of Sleepbit, and Wood solicited a proposal for the mobile app required by Sleepbit. Dkt. # 2-1, at 7. PSI and Sleepbit executed a confidentiality agreement, and Jones signed the confidentiality agreement on behalf of PSI. Dkt. # 22-1, at 19-21. In February 2015, Sleepbit formally submitted a request for proposal to PSI, and PSI sent a proposal to Sleepbit approximately one week later. Dkt. # 2-1, at 7-8. PSI represented that it would take nine to eleven weeks to develop the mobile app, and PSI and Sleepbit agreed on a payment schedule. Id. at 8. Jones signed the proposal on behalf of PSI and, in August 2015, Wood advised PSI that Sleepbit had obtained the necessary funding to begin development of the mobile app. Id. at 9. Sleepbit wired an initial payment to PSI in August 2015, and Jones and Doucette represented that development of the mobile app was proceeding as promised in PSI's proposal. Id. at 10. Sleepbit sent a device to PSI for use in testing the mobile app, but PSI could not not use the device to successfully collect data. Id. By June 2016, PSI had not completed its work on the mobile app and Sleepbit sent additional devices to PSI, and PSI represented to Sleepbit that it was progressing with its work. Id. at 11. Sleepbit sent another payment to PSI on July 22, 2016,

but Sleepbit claims that it was becoming apparent that PSI was having problems with the mobile app. Id. In November 2016, Jones spoke to an individual working on Sleepbit's device who was attempting to connect to the mobile app, and Jones stated that PSI had the mobile app working on iOS devices but not on Android devices. Id. at 11-12. By early 2017, Sleepbit claims that Jones had stopped communicating with Sleepbit concerning the status of the mobile app, and representatives of Sleepbit and PSI held a conference call on February 16, 2017. Jones agreed to send Sleepbit the iOS and Android source code and the Sleepbit mobile app to allow Sleepbit to troubleshoot any problems with the interaction of the app and the device, but Sleepbit did not receive any of the items until March 7, 2017. Id. at 13. When Sleepbit received the iOS source code, the mobile app was obviously incomplete and it appeared that no one had worked on the app for several months. Id. at 14. On March 31, 2017, Jones advised Sleepbit that PSI had conducted successful testing of the mobile app, but he refused to provide an estimate of when the mobile app would be complete. Id. Jones and Wood continued to interact about testing and completion of the mobile app, but Sleepbit decided to terminate its relationship with PSI in August 2017. Id. at 16-17.

PSI's briefing focuses on the forum selection clause in the confidentiality agreement as the sole basis that the Court could possibly exercise jurisdiction over PSI. Sleepbit's petition contains extensive allegations concerning the parties' business relationship, and it is clear that PSI had an extended relationship with an Oklahoma business. For minimum contacts to give rise to specific personal jurisdiction, there must be a nexus between PSI's forum-related contacts and plaintiff's cause of action. See OMI Holdings, 149 F.3d at 1095. The plaintiff must also show that the defendant purposefully directed its activities to a resident of the forum state. Old Republic Ins. Co., 877 F.3d at 904. This requires the Court to potentially consider three separate frameworks for

establishing purposeful direction: "(1) continuing relationships with forum state residents ('continuing relationship'); (2) deliberate exploitation of the forum state market ('market exploitation'); and (3) harmful effects in the forum state ('harmful effects').

The Court finds that PSI and Jones had a continuing relationship with a forum resident, Sleepbit, and this satisfies the requirement that PSI purposefully directed its activities to the forum state. It is undisputed that Sleepbit initiated the business relationship and it does not appear that a representative of PSI ever traveled to Oklahoma as part of the contract negotiations or subsequent business dealings. However, PSI submitted a proposal to Sleepbit for the development of a mobile app and represented that it would take nine to eleven weeks to develop the app. Dkt. # 2-1, at 8. Sleepbit also alleges that the parties agreed on a payment schedule and that it made payments to PSI pursuant to the payment schedule. Id. at 9-10. However, PSI took much longer than anticipated to develop the mobile app, and Jones regularly communicated with Sleepbit concerning the problems that PSI was having in completing its work. Id. Jones had many contacts with Sleepbit on behalf of PSI over the course of the parties' relationship, and Jones knew or should have known that he was interacting with a business located in Oklahoma. Sleepbit and PSI had an ongoing business relationship for over two years, and PSI and Jones could have reasonably foreseen being haled into an Oklahoma court if litigation arose out of a contractual dispute with Sleepbit.

As the Court has found that PSI and Jones have minimum contacts with Oklahoma, the Court must now "consider whether the exercise of personal jurisdiction over the defendant[s] offends 'traditional notions of fair play and substantial justice.'" OMI Holdings, 149 F.3d at 1091. The touchstone of this analysis is whether the exercise of personal jurisdiction would be "reasonable." Id. The determination of reasonableness "evokes a sliding scale: the weaker the plaintiff's showing

15

on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts]." <u>Id.</u> at 1092 (quoting <u>Ticketmaster-New York, Inc. v. Alioto</u>, 26 F.3d 201, 210 (1st Cir. 1994)).

The Tenth Circuit has provided district courts five factors to consider in determining whether exercise of personal jurisdiction would offend fair play and substantial justice. The first factor is the burden on defendant of litigating in plaintiffs' chosen forum. <u>Id.</u> The Tenth Circuit has said that "[t]his factor is of special significance, because it serves to prevent the filing of vexatious claims in a distant forum where the burden of appearing is onerous." <u>Id.</u> at 1096 (citing <u>World-Wide Volkswagen</u>, 442 U.S. at 292). The second factor analyzes Oklahoma's interest in resolving the parties' dispute. <u>OMI Holdings</u>, 149 F.3d at 1095. Oklahoma "generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." <u>Burger King</u>, 471 U.S. at 474 (quoting <u>McGee v. Int'l Life Ins. Co.</u>, 355 U.S. 220, 223 (1957)). The third factor examines "the plaintiff's interest in receiving convenient and effective relief" in the forum state. <u>OMI Holdings</u>, 149 F.3d at 1095. "This factor may weigh heavily in cases where a [p]laintiff's chances of recovery will be greatly diminished by forcing him to litigate in a another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." <u>Id.</u> at 1097 (citing <u>P. Atl. Trading Co. v. M/V Main Express</u>, 758 F.2d 1325, 1331 (9th Cir. 1985)). The fourth factor concerns "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," which the Tenth Circuit has stated is the examination of "whether the forum state is the most efficient place to litigate the dispute." <u>Id.</u> "Key to the inquiry are the location of witnesses, where the wrong underlying the

lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." Benton, 375 F.3d at 1079 (quoting OMI Holdings, 149 F.3d at 1097). The fifth and final factor examines "the interests of the several states, in addition to the forum state, in advancing fundamental substantive social policies." OMI Holdings, 149 F.3d at 1097.

PSI and Jones are citizens of a foreign county and there is a heightened concern for burdens on litigants who are required to defend themselves in a foreign country. OMI Holdings, Inc., 149 F.3d at 1096. Plaintiff acknowledges that PSI and Jones are resident of Canada and that they have no systematic contacts with Oklahoma, but plaintiff makes the broad and unsupported argument that litigation places a minimal burden on litigants in the modern world.[3] Dkt. # 19, at 23-24. Plaintiff fails to recognize that there is a heightened concern for subjecting foreign citizens to personal jurisdiction in the United States, and plaintiff's arguments as to the burden on defendants are unpersuasive. The Court finds that the first factor supports PSI and Jones' arguments that it would be unreasonable to subject them to personal jurisdiction in Oklahoma. As to the second factor, Oklahoma has an interest in providing a forum for its residents to resolve disputes and this factor favors plaintiff. The third factor (plaintiff's interest in convenient and effective relief) requires the Court to consider whether plaintiff could obtain complete and effective relief in another forum, and plaintiff's briefing largely ignores this issue. Sleepbit focuses on whether it would be burdensome for it to litigate in Canada, but it makes no attempt to show that it would be legally prejudiced if it

---

[3]    Sleepbit simultaneously argues that defendants would face little or no burden by defending themselves in a distant forum but the cost of litigating in Canada would impose an unreasonable burden on Sleepbit. Dkt. # 19, at 24. Neither argument is supported by any facts specific to this case and the Court gives no weight to Sleepbit's arguments concerning the relative costs or burdens of litigation.

were required to bring this case in a Canadian court. Sleepbit has not shown that it would be unable to obtain complete or effective relief in a Canadian court. Sleepbit argues that the it would be substantially more convenient for it to litigate in Oklahoma, and it argues that it would be difficult and expensive for it to litigate in a foreign court. Dkt. # 19, at 24. Sleepbit acknowledges that there are witnesses located in Canada and Oklahoma and PSI's actions took place in Canada, but it argues that PSI's actions were felt by Sleepbit in Oklahoma. Id. at 25. In this case, there is no one forum that is necessarily the most convenient for all parties, and there will be some inconvenience to the parties no matter where the case is litigated. The plaintiff has strong ties to the forum state and the forum state has an interest in providing a forum to the plaintiff, and the Court finds that the fourth factor tends to favor the exercise of personal jurisdiction over PSI and Jones. Finally, the Court must consider whether exercising personal jurisdiction over defendants would affect the substantive social policies or interests of a foreign state or country. OMI Holding, Inc., 149 F.3d at 1097-98. Neither PSI nor Jones has offered any argument that it would impact the substantive social policies or interests of Canada if the Court were to exercise personal jurisdiction over them.

The Court finds that the factors concerning traditional notions of fair play and substantial justice are relatively balanced in this case. Sleepbit clearly has a strong interest in litigating this case in its home forum, and Oklahoma likewise has a strong interest in providing a forum for its citizens. However, this case involves citizens of a foreign country and the Court must show "great care and reserve" when considering whether to exercise personal jurisdiction over a resident of a foreign country. Id. at 1097. Sleepbit offers no argument that it would be prejudiced if the case were litigated in Canada and Sleepbit's arguments concerning the burdens it would face by litigating in Canada are relatively weak. While these factors do not strongly favor either party, Sleepbit has made

18

a strong showing that PSI and Jones have minimum contacts with Oklahoma based on an extended business relationship with an Oklahoma resident. The issue of reasonableness is determined on a sliding scale, and the strong showing of minimum contacts supports the exercise of personal jurisdiction over PSI and Jones, even with a relatively neutral showing as to the reasonableness factors. Id. at 1091. The Court finds that it has specific personal jurisdiction over PSI and Jones and it will not offend traditional notions of fair play and substantial justice for the Court to exercise personal jurisdiction over them. PSI's motion (Dkt. # 12) and Jones' motion (Dkt. #16) to dismiss for lack of personal jurisdiction are dismissed.

**Doucette**

Sleepbit's primary argument to show that Doucette is subject to personal jurisdiction in Oklahoma is that the forum selection clause in the confidentiality agreement is applicable to Doucette. Dkt. # 20, at 13-19. Sleepbit's allegations concerning Doucette's involvement in the development of the mobile app are fairly minimal. There are no allegations that Doucette was involved in contract negotiations or that he solicited Sleepbit's business on behalf of PSI. Sleepbit alleges that Doucette was a product director for PSI and that he was responsible in the scope of his employment for developing the mobile app that was requested by Sleepbit. Dkt. # 2-1, at 10. Sleepbit claims that it paid PSI in July 2016 "based upon representations of Doucette and Jones to Wood." Id. at 11. Sleepbit states its future communications with PSI came from Jones, and Doucette may have been removed as the project manager for the project. Id. at 12-13. This appears to be the sum of the factual allegations concerning Doucette's involvement with the development of the mobile app.

Applying the same framework applicable to PSI and Jones, Sleepbit must make at least a prima facie showing that there is a nexus between Doucette's contacts with Oklahoma and Sleepbit's claims and that Doucette purposefully directed his activities to a resident of Oklahoma. At most, Sleepbit has alleged that Doucette was a product manager for PSI and that he was assigned by his employer to work on Sleepbit's project. There are no allegations that Doucette had any role in soliciting Sleepbit's business or that he actively petitioned to work on Sleepbit's project. Doucette was also not a party to any contractual agreements between PSI and Sleepbit. The Court will assume that Doucette made representations to Sleepbit about the status of the mobile app, but it is unclear from the petition whether Doucette reached out to Sleepbit to make these representations or whether Sleepbit contacted Doucette. These allegations could support a nexus between plaintiff's claims and Doucette's alleged contacts with the forum state, albeit a fairly tenuous nexus. However, there are no allegations that would support a finding that Doucette purposefully directed his activities to a resident of Oklahoma. The Court finds that Sleepbit has not made a prima facie showing that Doucette has sufficient minimum contacts with Oklahoma that would allow this Court to exercise personal jurisdiction over him. Doucette's motion (Dkt. # 14) to dismiss the claims against him for lack of personal jurisdiction should be granted.

**IT IS THEREFORE ORDERED** that Defendant Push Software Interactions, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Dkt. # 12), Defendant Chad Jones' Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Dkt. # 16), and Sleepbit, LLC's Motion to Transfer Venue and Brief in Support (Dkt. # 22) are **denied**.

**IT IS FURTHER ORDERED** that Defendant Andre Doucette's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Dkt. # 14) is **granted**, and the Court Clerk is directed to terminate Andre Doucette as a party.

**DATED** this 20th day of June, 2019.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE